UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAMIAN JOSEPH SHEEHAN,

        Plaintiff,

v.                            CASE NO.  8:13-CV-2175-T-17TGW

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

        Defendant.

_____/

ORDER

This cause is before the Court on:

Dkt. 25   Report and Recommendation
Dkt. 26   Objections
Dkt. 27   Response to Objections

In his Complaint, Plaintiff Sheehan seeks review of the denial of his claims for Social Security disability benefits and supplemental security income benefits.  The assigned Magistrate Judge has entered a Report and Recommendation in which it is recommended that the decision of the Commission denying benefits be affirmed since it is supported by substantial evidence and does not contain reversible error.

Plaintiff Sheehan's alleged onset date is December 18, 2009.  Plaintiff's date of last insurability is March 31, 2015.

The Court has independently reviewed the pleadings and the record.   Plaintiff Sheehan has filed Objections to the Report and Recommendation.  The Government

Case No. 8:13-CV-2175-T-17TGW

has responded to Plaintiff's Objections.

I. Standard of Review

A. Report and Recommendation

The District Court reviews <u>de novo</u> the portions of the Report and
Recommendation or specified proposed findings to which an objection is made. The
District Court may accept, reject, or modify in whole or in part the report and
recommendation of a magistrate judge, or may receive further evidence, or may
recommit the matter to the Magistrate Judge with instructions.

B. Social Security Claim

This Court's role in reviewing claims brought under the Social Security Act is a
narrow one. The scope of its review is limited to determining: (1) whether there is
substantial evidence in the record as a whole to support the findings of the
Commissioner, and (2) whether the correct legal standards were applied. <u>Richardson
v. Perales</u>, 402 U.S. 389, 390, 401 91 S.Ct. 1420, 28 L. Ed. 2d 842 (1971); <u>Lamb v.
Bowen</u>, 847 F.2d 698, 701 (11th Cir. 1988). The Court may not decide facts, reweigh
evidence, or substitute its judgment for that of the Commissioner.  <u>See</u> <u>Bloodsworth v.
Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983).  However, this limited scope does not
render affirmance automatic, for "despite [this] deferential standard for review of claims
. . . [the] Court must scrutinize [the] record in its entirety to determine reasonableness of
the decision reached." <u>Bridges v. Bowen</u>, 815 F.2d 622 (11th Cir. 1987); <u>Lamb</u>, 847
F.2d at 701. Moreover, failure to apply the correct legal standards is grounds for
reversal. <u>Bowen v. Heckler</u>, 748 F.2d 629, 634 (11th Cir. 1984).

2

Case No. 8:13-CV-2175-T-17TGW

With respect to the sequential analysis, the burden rests with the claimant through the first four steps of the analysis, and shifts to the Commissioner at step five. See Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007).

II. Discussion

The Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled.  20 CFR 4045.1520(a) and 416.920(a).  The steps are followed in order.  If it is determined that a claimant is or is not disabled at a step in evaluation process, the evaluation will not go on to the next step.

At Step Two of the evaluation process, Plaintiff Sheehan has the mild burden of showing that Plaintiff has an impairment which has more than a minimal impact on Plaintiff's ability to perform basic work activities.  See Flynn v. Heckler, 768 F.2d 1273 (11th Cir. 1985).  In this case, the ALJ determined that Plaintiff has the following severe impairments: bipolar disorder, posttraumatic stress disorder and chronic low back pain status post discectomy in 2009.

At Step Three, the ALJ determined that Plaintiff Sheehan does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  The ALJ states:

> Disability cannot be established under Section 1.04
> (disorders of the spine) as there is no evidence of nerve root
> compromise with appropriate neurologic abnormalities;
> spinal arachnoiditis confirmed by an operative note or
> pathology report; or lumbar spinal stenosis resulting in
> pseudoclaudication and resulting in an inability to ambulate
> effectively.

3

Case No. 8:13-CV-2175-T-17TGW

(Dkt. 12-2, p. 25). The ALJ evaluated the severity of Plaintiff's mental impairments, considered singly and in combination, and determined that Plaintiff's mental impairments do not meet or medically equal the criteria of listings 12.03 and 12.04.

20 CFR Part 404, Subpart P, Appendix 1 provides:

1.00 Musculoskeletal System

......

B. Loss of function.

......

2. How We Define Loss of Function in These Listings

a. General. Regardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months. For the purposes of these criteria, consideration of the ability to perform these activities must be from a physical standpoint alone....We will determine whether an individual can ambulate effectively or can perform fine and gross movements effectively based on the medical and other evidence in the case record, generally without developing additional evidence about the individual's ability to perform the specific activities listed as examples in 1.00B2b(2) and 1.00B2c.

b. What We Mean by Inability to Ambulate Effectively

(1) Definition.......Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.......

4

Case No. 8:13-CV-2175-T-17TGW

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school.  Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail......

c.  What we mean by inability to perform fine and gross movements effectively.  Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain or complete activities.  To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living.  Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

d.  Pain or other symptoms.  Pain or other symptoms may be an important factor contributing to functional loss.  In order for pain or other symptoms to be found to affect an individual's ability to perform basis work activities, medical signs or laboratory findings must show the existence of a medically determinable impairment(s) that could reasonably be expected to produce the pain or other symptoms.  The musculoskeletal listings that include pain or other symptoms among their criteria for limitations in functioning as a result of the listed impairment, including limitations caused by pain.  It is, therefore, important to evaluate the intensity and persistence of such pain or other symptoms carefully in order to determine their impact on the individual's functioning under these listings.......

......

J.  Orthotic, Prosthetic or Assistive Devices

......

5

Case No. 8:13-CV-2175-T-17TGW

4. Hand-held assistive devices. When an individual with an impairment involving a lower extremity or extremities uses a hand-held assistive device, such as a cane, crutch or walker, examination should be with and without the use of the assistive device unless contraindicated by the medical judgment of a physician who has treated or examined the individual. The individual's ability to ambulate with and without the device provides information as to whether, or the extent to which, the individual is able to ambulate without assistance. The medical basis for the use of any assistive device (e.g. instability, weakness) should be documented. The requirement to use a hand-held assistive device may also impact on the individual's functional capacity by virtue of the fact that one or both upper extremities are not available or such activities as lifting, carrying, pushing, and pulling.

K. Disorders of the spine, listed in 1.04, result in limitations because of distortion of the bony and ligamentous architecture of the spine and associated impingement on nerve roots (including the cauda equina) or spinal cord. Such impingement on nerve tissue may result from a herniated nucleus pulposus, spinal stenosis, arachnoiditis, or other miscellaneous conditions. Neurological abnormalities resulting from these disorders are to be evaluated by referral to the neurological listings in 11:00ff, as appropriate. (See also 1.00B and E).

1. Herniated nucleus pulposus is a disorder frequently associated with the impingement of a nerve root. Nerve root compression results in specific neuro-anatomic distribution of symptoms and signs depending upon the nerve root(s) compromised.

......

1.01 Category of Impairments, Musculoskeletal

......

1.04 Disorders of the spine (e.g. herniated nucleus pulposus,...., degenerative disc disease, facet arthritis,...), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);......

6

Case No. 8:13-CV-2175-T-17TGW

Plaintiff Sheehan does not challenge the ALJ's Step Three determination.

After consideration of the entire record, the ALJ determined that Plaintiff Sheehan has the residual functional capacity ("RFC") to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c), and  Plaintiff should be limited to simple and routine tasks.

At Step Four, the ALJ determined that Plaintiff Sheehan is unable to perform past relevant work as a cable installer, cable installation supervisor, operating engineer and utility work, as the requirements of these positions exceed Plaintiff's RFC of simple and routine work.

At Step Five, after considering Plaintiff's RFC, age, education and work experience, and  based on the testimony of the VE, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff Sheehan can perform.  The ALJ therefore determined that Plaintiff Sheehan has not been under a disability from December 18, 2009 through the date of the decision, April 27, 2012.

A.  Plaintiff's Medical Treatment and Evaluation

Plaintiff's treatment, diagnostic tests and evaluation include:

| | | |
|---|---|---|
| 8/17/2009 | Sarasota Memorial Hospital | |
| 9/4/2009-11/19/2009 | Physicians Group, LLC Dr. E. Detweiler | Physical Therapy |
| 9/16/2009 | Axcess Diagnostics | MRIs Lumbar Spine Cervical Spine |
| 10/13/2009 | Physicians Group, LLC | X-ray |

Case No. 8:13-CV-2175-T-17TGW

| 11/13/2009 | Physicians Group, LLC | MRIs<br>Left shoulder<br>Left knee |
|---|---|---|
| 11/18/2009 | Dr. Gomes | Evaluation |
| 11/30/2009 | Dr. Gomes | Surgery |
| 12/18/2009 | Dr. Gomes | Follow up |
| 1/14/2010 | Dr. Gomes | Follow up |
| 1/25/2010 | Dr. Gomes | Follow up<br>MMI - 20% |
| 2/23/2010 | Dr. Cassell | Pain Management<br>Consultation |
| 3/09/2010 | Dr. Cassell | Trigger point injection |
| 3/16/2010 | Dr. Cassell | Trigger point injection |
| 4/6 /2010 | Dr. Cassell | Trigger point injection |
| 5/18/2010 | Dr. Cassell | Trigger point injection |
| 5/27/2010 | Physicians Group, LLC | MRI (brain) |
| 6/1/2010 | Dr. Cassell | Trigger point injection |
| 1/24/2011 | SWFL Regional<br>Imaging | X-ray (DDS)<br>Lumbar spine |
| 1/31/2011 | Dr. Pascal Bordy | Consultative Examination<br>(DDS) |
| 4/28/2011 | Dr. Gomes | Follow up<br>Examination |
| 6/3/2011-<br>9/16/2011 | Coastal Behavioral Healthcare,<br>Inc. | Hospitalization,<br>Medication, |

Case No. 8:13-CV-2175-T-17TGW

Individual Therapy

The records of Plaintiff's physical therapy (9/4/2009 to 11/19/2009) indicate that Plaintiff's pain improved with rest and medication.   The Court notes that, between September, 2009 and March, 2010, Dr. Gomes, and others at Physicians Group LLC, prescribed ibuprofen, cyclobenzaprine, Ultram, hydrocodone, Lortab, Medrol Dosepak, Lidoderm patches, and Soma.  These include pain medication, muscle relaxants, anti-inflammatory medication, and a local anesthetic.  Dr. Gomes's records indicate "no known drug allergies."

Plaintiff saw Dr. Gomes on 11/18/2009.   Dr. Gomes performed a laser discectomy and facet joint ablation on 11/30/2009, and Plaintiff returned to  Dr. Gomes on 12/10/2009, 1/14/2010, and 1/25/2010.   Dr. Gomes's records of those visits include only brief and conclusory clinical findings upon physical examination.  In determining Plaintiff was a surgical candidate on 11/18/2009, Dr. Gomes relied on the Plaintiff's reported symptoms and the diagnostic studies.

On November 18, 2009, Dr. Gomes states:

**ASSESSMENT:**

1. Status post MVA, dated 8/12/2009
2. Displacement of cervical disc
3. Displacement of lumbar disc
4. Lumbar facet joint dysfunction/effusion
5. Cervical and lumbar sprain/strain
6. Cervical and lumbar myofascial pain.

**RECOMMENDATIONS:**

I have reviewed the findings and options of treatment with the patient.  A pain management evaluation regarding cervical and lumbar pain has been

9

Case No. 8:13-CV-2175-T-17TGW

scheduled.  Per treating physician, the patient is to follow up with a urologist regarding incontinence.  Left should and left knee MRIs have been performed; results are pending.  In my opinion, the patient is a surgical candidate for percutaneous endoscopic laser discectomy/arthroscopic laser facet ablation at L4-5 and L4-S1, respectively, with estimated global cost of $40,000-$45,000 for surgery.  The patient wishes to schedule surgery.  If symptomology worsens in the future, he may go on to require a lone level anterior cervical discectomy and fusion at C5-6, with estimated global cost of $55,000-$60,000 for surgery, and a one level lumbar laminectomy, discectomy and fusion at L5-S1, with estimated global cost of $60,000-$65,000 for surgery.  The patient is to avoid lifting, pushing or pulling over 20 lbs., as well has high impact activity and overhead lifting.  In my opinion, he has suffered a permanent cervical injury as a result of the MVA that occurred on 8/12/009.

Dr. Gomes performed surgery on November 30, 2009.  On December 10, 2009, Dr. Gomes states:

**ASSESSMENT:**

Post-op PELD and ALFA, L-4-5 and L4 through S1, overall improvement.

**RECOMMENDATIONS:**

The patient is to continue to wear the lumbar orthosis.  He is going to go back to work in a week at light duty.  He is to avoid any lifting over 25 to 30 pounds.  No repetitive bending or high impact activities.

On January 14, 2010, Dr. Gomes states:

**ASSESSMENT:**

Post-op laser discectomy and facet joint ablation at L4-5 and residual facet joint syndrome on the left.

**RECOMMENDATIONS:**

I wrote a prescription for Medrol Dosepak, pain mediations, and Lortab 60 one p.o. b.i.d.  The patient is to been (sic) four weeks from now and also

Case No. 8:13-CV-2175-T-17TGW

the patient has been referred to the pain management doctor to address the cervical spine complaints.   The patient is to continue to wear the lumbar orthosis and avoid any lifting over 20 pounds.  No repetitive bending or high impact activities.  The patient is to remain off work for now.

On January 25, 2010, Dr. Gomes states:

**RECOMMENDATIONS:** He is going to be seen by pain management doctor on 09th March.  He is taking over-the-counter anti-inflammatory agents.  I have given him a limited refill of 30 tablets for a weak (sic), no more than 3 a day.  The patient is to continue to wear the lumbar orthosis. From my point of view, he is at maximum medical improvement.  His PPI or permanent physical impairment range is 20% to the body as a whole. He is to be restricted to no repetitive lifting over 20 to 25 pounds.  No repetitive bending or high impact activities.  The patient is to call me on an as needed basis.

(Dkt. 12-8, p. 73).

Plaintiff was evaluated by Dr. Lance Cassell for chronic cervical pain on February 23, 2010.  The questionnaire Plaintiff completed for Dr. Cassell on 2/23/2010 states "no drug allergies" (Dkt. 12-8, p. 61).  At that time, Plaintiff was taking hydrocodone prescribed by Dr. Gomes.   On March 12, 2010, Dr. Cassell prescribed Soma 350.  Dr. Cassell's records indicate that trigger point injections improved Plaintiff's neck pain; the injections were done five times, from March, 2010 to June, 2010, at which time Dr. Cassell referred Plaintiff for a chronic pain evaluation.

On June 1, 2010, upon examination, Dr. Cassell noted:

**PHYSICAL EXAMINATION:**

General:     He is alert and in no apparent distress.  His gait is normal.
Lungs:       Breathing is non-labored.
Extremities: He has full range of motion of all four limbs without the
             production of pain.  Hawkins and Neer's signs are both

11

Case No. 8:13-CV-2175-T-17TGW

> unremarkable.  Peripheral pulses are grossly intact
> bilaterally.

**Spinal examination:**
Cervical spine: Range of motion is restricted in right and left rotation and
extension with the production of localized cervical axial spinal discomfort.
Spurling's sign is negative for any radiculopathy but does produce
localized cervical axial spinal pain.  He has tenderness and paraspinous
hypertonicity suboccipital to C7 region bilaterally.  Provocative maneuvers
of cervical facet reproduce significant portion of his pain.

Thoracic spine: He has tender myofascial trigger points throughout the
trapezius and periscapular musculature.

Lumbar spine: Lumbosacral range of motion is restricted in both flexion
and extension with pain equal on both.  Straight leg raising is negative for
any radicular symptomology.  He has tenderness and paraspinous
hypertonicity L3 through S1 paraspinal and bilaterally.

**Neurological exam**: Deep tendon reflexes are symmetrical.  Sensory
examination shows diminished sensation in the upper extremity and
bilateral lower extremity diffusely.  Motor exam is 5/5 bilaterally.

**RESULTS OF DIAGNOSTIC STUDIES:** MRI scan of the brain dated
05/07/10 per Dr. Witek's report is unremarkable.  MRI scan of lumbar
spine from Access Diagnostic dated 09/16/2009 per report shows broad
based disc protrusion extending slightly more to the midline and
impressing on the ventral aspect of the thecal sac at L5-S1 mild
adenomatous [sic] changes of the L5-S1 level which may correlated with
microinstability.  MRI scan of the cervical spine from Access Diagnostics
dated 09/126/2009 per report shows mild degenerative disc disease at
C5-C6 level where there is a small midline disc protrusion slightly
compressing the ventral aspect of the thecal sac.

Dr. Cassell prescribed no medication as of the last office visit in June, 2010.

On January 31, 2011, Dr. Pascal Bordy, a consultative examiner, after reviewing
all information provided by the Bureau of Disability Determination Services, and taking a
history, performed a comprehensive physical exam, which includes detailed clinical
findings.  (Dkt. 12-10, pp. 62-78).   At that time, in the "History of Chief Complaints" Dr.

12

Case No. 8:13-CV-2175-T-17TGW

Bordy states no weakness associated with chronic neck and low back pain, Plaintiff is not using an assistive device; Plaintiff is able to walk one block, can stand for ten minutes and sit for thirty minutes.  Dr. Bordy notes that Plaintiff is not treated at that time.  On physical examination, Dr. Bordy states that Plaintiff's general appearance is as follows:

> **General appearance** is that of a well-developed, well-nourished male who is in pain.  Claimant has difficulty to stand from a sitting position and walks in pain 80 feet in the office with a limp but without a cane.  Claimant is antalgic and his lumbar spine is straightened secondary to muscle spasms.

Dr. Bordy notes, <u>inter alia</u>, no muscle atrophy, normal motor strength and normal sensation in upper and lower extremities.  Dr. Bordy found Plaintiff's strength and fine manipulation in upper extremities to be normal ("Normal, able to oppose thumb to fingers, touch finger tips to palm, can hold a pen and sign name").  Although the "Range of Motion" form is difficult to read, the Report indicates some restriction in range of motion in Plaintiff's cervical spine and lumbar spine.  As to Plaintiff's cervical spine, the maximal compression test with Spurling maneuver was positive bilaterally.  As to Plaintiff's lumbar spine, the Seated Lasegue test was positive on the left, and the Braggard test was positive on the left.   Dr. Bordy further notes hypertonic, tender paraspinal musculature in the upper cervical spine, occipitalis, frontalis and lumbar spine.  Dr. Bordy further notes that, as to ambulation, Plaintiff is able to squat halfway secondary to pain, can walk on toes and heels bilaterally with significant pain, and can perform a tandem gait.  Dr. Bordy also notes "sensation and deep tendon reflexes were symmetric and within normal limits bilaterally."   Dr. Bordy made the following assessment:

Case No. 8:13-CV-2175-T-17TGW

**CLINICAL IMPRESSION:**

**Chronic lumbar, lumbosacral pain and strain s/p laser discectomy, arthroscopic facet ablation at L4-L5 and L5-S1 with disc herniation and protrusion at L5-S1 with radiculopathy and myofascitis;**

**Chronic cervical pain and strain with bulging disc at C5-C6 with radiculopathy, occipital neuralgia and myofascitis;**

**Possible depression.**

Thereafter, on April 28, 2011, Plaintiff returned to Dr. Gomes for follow up of Plaintiff's increased symptomology of severe left-sided radicular pain. Dr. Gomes states that Plaintiff has developed progressive difficulty walking, now walks with the assistance of a cane, and has fallen three times with Plaintiff's left leg giving out. Dr. Gomes made the following findings on physical examination:

Neurological and spinal exam shows his gait to be severely antalgic. He cannot bear weight on the left leg. Thoracolumbar range of motion severely decreased in flexion, left lateral bending and rotation with pain. There is bilateral facet joint tenderness, predominantly at L5-S1. There is positive straight leg raising test on the left at 20 degrees, and 45 degrees with low back and radicular pain. The strength, he has moderate weakness on plantarflexion on the left, 4/5. Deep tendon reflexes are hypoactive throughout, patella and Achilles reflex. Sensory examination shows hypesthesia S1 dermatome on the left. The exam of the cervical spine as a result of persistent complaints of neck pain and headaches a 9/10 shows decreased range of motion of the cervical spine in flexion, extension, right and left lateral bending and rotation. The axial compression test and foraminal test is positive for bilateral radiculopathies. The strength in the upper extremities is normal. Reflex is hypoactive but symmetrical. No sensory loss in the upper extremities.

At that time, Dr. Gomes made the following assessment:

Assessment:

14

Case No. 8:13-CV-2175-T-17TGW

1. Chronic cervical and lumbar pain syndrome
2. Symptomatic discogenic cervical disc protrusion at C5-6
3. Chronic low back pain syndrome
4. Recurrent left lumbar radiculopathy
5. Post-op laser discectomy and facet joint ablation, L4-S1
6. Lumbar disc protrusion L5-S1 to left consistent with patient symptomology

**Recommendations:**

**In all probability this patient will end up requiring open lumbar laminectomy and discectomy and left side foraminotomy and segmental fusion at L5-S1, Smith-Robinson technique at C5-6. Based on the severity of symptoms and progressive neurological deterioration, it is my opinion within reasonably medical probability that this patient will not be able to return to sustainable gainful employment. In my opinion the patient has total and permanent disability. In addition due to the severity of the symptoms and the neurological involvement it is my opinion that the patient requires a motorized wheelchair.**

Dr. Gomes did not any prescribe medication on 4/28/2011.

On June 7, 2011, Plaintiff was admitted to the hospital for three days, through the Crisis Stabilization Unit of Coastal Behavioral Healthcare, Inc. Dr. Matthew Thomas diagnosed bipolar affective I disorder, mixed, severe with psychosis. The records of Coastal Behavioral Healthcare, Inc. indicate treatment on 7/7/2011, 7/19/2011, 8/19/2011 and 9/16/2011. The records further state that Plaintiff cancelled his appointment on 10/13/2011, and did not reschedule it. During treatment, the following medications were prescribed: trazodone, Risperdal, Zydis, Seroquel, Zyprexa, Restoril and Saphris. These include a tetracyclic antidepressant, antipsychotics, and a benzodiazepine. The Coastal records refer to Plaintiff's attempt to obtain further treatment from North Port Health Department. Plaintiff reported to Coastal that he was allergic to hydrocodone, but there is no mention of Plaintiff's allergy in the records of Physicians Group, LLC, which prescribed hydrocodone to Plaintiff.

15

Case No. 8:13-CV-2175-T-17TGW

There are no treatment records from North Port Health Department in the record.

B.  The ALJ's RFC Determination

In determining Plaintiff's RFC, the ALJ considered all of Plaintiff's symptoms, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical records and other evidence.   Because one of Plaintiff's severe impairments is pain, the ALJ was required to apply the "pain standard."

When a claimant attempts to establish disability through her own testimony of subjective pain, the "pain standard" applies.  Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).  The pain standard requires: 1) evidence of an underlying medical condition and 2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or 3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. The "pain standard"  applies to complaints of subjective conditions other than pain.  Holt v. Sullivan, 921 F.2d 1221 (11th Cir. 1991).  When coupled with medical evidence which satisfies the pain standard, a claimant's testimony of subjective pain is, in and of itself, sufficient to sustain a disability determination.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

The Court notes the discussion of the development of the "pain standard" in Rychel v Astrue, 2010 WL 3110376 (M.D. Fla. 2010)(citing Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1214-16 (11th Cir. 1991)(discussing history of pain standard)).  The purpose of the alternative test in the pain standard would have been to permit pain findings to be based on objective medical evidence if, in the future, medical procedures were developed to test the severity of pain.

16

Case No. 8:13-CV-2175-T-17TGW

The Court notes that, at Step Two, the ALJ states that Plaintiff's chronic low back pain is a severe impairment, without any reference to Plaintiff's chronic pain caused by a herniated disc at C5-C6.   Once the ALJ proceeds beyond Step Two, the ALJ is required to consider a claimant's entire medical condition.   In this case, the ALJ considers Plaintiff's chronic cervical pain along with other impairments in determining Plaintiff's RFC, and at the subsequent steps in the sequential analysis.

Plaintiff's claim for disability benefits is premised primarily on the presence of constant, intractable pain.   The medical evidence shows that Plaintiff has a herniated disc at C5-6, and a herniated disc at L4-5, conditions which could reasonably give rise to the pain Plaintiff alleges.   Plaintiff has had conservative treatment (medication, chiropractic treatment, physical therapy, trigger point injections) and some surgery (laser discectomy and facet joint ablation).   After some improvement after surgery and trigger point injections (as of June, 2010, 40 % improvement), Plaintiff contends the constant pain returned and worsened.   When a claim is not decided on the Listings at Step Three, how Plaintiff's impairment affects his ability to work becomes an issue.   At Step Four, the burden is on Plaintiff to furnish medical and other evidence about his impairments and the effects on Plaintiff's ability to work on a sustained basis.   Plaintiff's credibility is a critical issue in this case, and, as the assigned Magistrate Judge notes, Plaintiff has not challenged the ALJ's determination as to Plaintiff's credibility.

At the hearing before the ALJ, Plaintiff testified as to pain in going from his low back into his left leg, with numbness and tingling, pain across his low back to right buttock, which causes numbness, pain going through forearms to middle fingers on both hands, with severe pain with use such as grabbing and elevating arms over Plaintiff's head, and headaches.   Plaintiff testified he uses a cane every day, but it was not prescribed by a doctor.   Plaintiff testified that he spends 60 to 70 percent of the day in bed, which slightly relieves his back pain, along with some walking to the restroom and to the back yard and back.   Plaintiff denied taking any medication, including pain

17

Case No. 8:13-CV-2175-T-17TGW

medication, due to side effects, and testified that he last took medication in October, 2011. Plaintiff testified he does not see any doctors, and last saw a doctor in October, 2011. (Dkt. 12-2, pp. 87-89).

Plaintiff has testified to the presence of constant, intractable pain which incapacitates Plaintiff such that Plaintiff performs the activities of daily living with great difficulty (Dkt. 12-2, pp. 91-94). Plaintiff further testified that Plaintiff is unable to grasp and hold objects, because his fingers are numb and tingly, and he "does not have the sensation of knowing whether or not [he] has weight in his hand. (Dkt. 12-2, p. 90). Plaintiff further testified to difficulty fastening buttons, problems with zippers, and is able to turn a doorknob with great difficulty and pain. (Dkt. 12-2, p. 91). Plaintiff further testified that Plaintiff's memory is very poor, that he gets headaches on a daily basis, and he cannot focus to watch an entire movie (Dkt. 12-2, pp. 92-93). Plaintiff further testified that driving is painful, due to pain from applying pressure to the accelerator, sitting, and rotating his head. (Dkt. 12-2, p. 95).

As to medication, Plaintiff testified that he takes aspirin for a headache. Plaintiff further testified that the medication prescribed at Coastal Behavioral Healthcare, Inc. was ineffective to prevent Plaintiff from hearing things, seeing shadows, and improving Plaintiff's sleep, and caused side effects such as increased pain, increased headaches, an upset stomach, vomiting, diarrhea, and the need for a bathroom break every 15-20 minutes. (Dkt. 12-2, pp. 95-96). Plaintiff further testified that Plaintiff cannot lift a gallon, cannot scoot forward, and could only sit looking down at a table or counter for three to five minutes. (Dkt. 12-2,p. 96).

In the decision, the ALJ notes Plaintiff's testimony at the hearing:

The claimant testified that he cannot work due to pain radiating down his left arm. He stated that he cannot lift or grip as dropped things due to

18

Case No. 8:13-CV-2175-T-17TGW

numbness and tingling.  He commented that he dropped clothing, shoes and gallons of milk.  However, he also mentioned that he uses a stick-type cane for ambulation.  He noted that he lies in bed 60 - 70% of the day but can do a little walking to about 100 feet.  He stated that he did not take any medication and does not have a primary care doctor.  He remarked that he last took medicine in October 2011 and he last visited with Dr. Camdon.  He did not claim any income in spite of having his own company as he stated that he did not require much to live.  He further testified that he survived by bartering services even though he never worked off the books.  For example, his son provided cigarettes and his parents provided housing.

After consideration of the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they are inconsistent with the RFC assessment.

In making a determination of Plaintiff's credibility, the ALJ identified the following inconsistencies:

1.  Plaintiff testified at the hearing that he has a poor memory, but Plaintiff was a good witness at the hearing;

2.  There have been significant periods since the alleged onset date during which Plaintiff has not taken medication for his symptoms;

3.  Plaintiff testified that Plaintiff was not taking medications and did not have medical treatment because of his medicine's side effects;

4.  Plaintiff alleged hearing voices and seeing shadows and his medications did not take care of his problems.

In considering the opinion evidence, the ALJ placed minimal weight on the opinions of Dr. Gomes, who stated that Plaintiff should avoid lifting anything over 20

19

Case No. 8:13-CV-2175-T-17TGW

lbs., and not perform repetitive bending or high impact activities. Dr. Gomes also stated that Plaintiff was totally and permanently disabled. The ALJ explained that Dr. Gomes's opinion is not consistent with Dr. Gomes' medical records, noting the January 2011 x-ray with normal signs and MRI with unremarkable results in June 2010. The ALJ further explained that Dr. Gomes' opinion contradicts Plaintiff's statements, including the fact that Plaintiff did not take medicine as prescribed. The ALJ concluded that, because Plaintiff did not exhibit the extreme exacerbations that Dr. Gomes alleged in his medical source statement, Dr. Gomes opinion is not supported and is not consistent with the overall medical evidence of record.

The ALJ accorded significant weight to the opinion of the DDS medical consultant, Dr. Molis, who stated that Plaintiff could perform medium exertional work. The ALJ stated that Dr. Molis's opinion is supported by treatment records and Plaintiff's testimony that he does not see the doctor or take his medicine. The ALJ also notes that Dr. Molis's opinion is based on a review of a complete case record that includes a medical report from a specialist which provides more detailed and comprehensive information than what was available to the individual's treating source [report of Dr. Bordy]. The ALJ concluded that the DDS medical consultant's opinion is supported by and consistent with the medical evidence of record, consistent with SSR 96-6p.

The ALJ further explained the little weight the ALJ accorded to the statements of Bernadette Fowler in the third party function report. The ALJ notes that Ms. Fowler had not seen Plaintiff since 2010, did not know the answer to a number of questions in the survey, as she only saw him on weekends, and the statement has little support in the medical evidence.

C. Plaintiff's Objections

The Court notes that Plaintiff does not challenge the credibility determination of

20

Case No. 8:13-CV-2175-T-17TGW

the ALJ.   Plaintiff does object to the inference drawn by the assigned Magistrate Judge that, since Plaintiff has not challenged the ALJ's credibility determination, the ALJ could reasonably think that the subjective complaints Plaintiff was stating to Dr. Gomes in April 2011 were not fully credible.  Plaintiff argues that it is improper for the reviewing court to justify the ALJ's rejection of Dr. Gomes's opinion on bases other than those articulated by the ALJ.

Plaintiff further argues that this inference assumes that Dr. Gomes based his medical opinion on Plaintiff's subjective complaints, rather than on Dr. Gomes's objective findings on examination.

The Court notes that the ALJ's RFC determination which limits Plaintiff to simple and routine tasks recognizes that Plaintiff has some limitation due to pain and other non-exertional impairments.

As to the ALJ's determination that Plaintiff was only partially credible as to Plaintiff's impairments and the degree of severity of those impairments, the Court notes that in reports to the agency, Plaintiff complained of ongoing severe pain, but there is no treatment for chronic pain after 6/1/2010.   In reports to the Agency, Plaintiff stated that Plaintiff does not have the financial means to pay doctors or for medicine. However, after a gap of nine months, Plaintiff  was able to return Dr. Gomes for an additional evaluation on 4/28/2011.   Dr. Gomes recommended more surgery, but prescribed no medication.

Plaintiff has also explained that he is allergic to hydrocodone, but there is a conflict between Plaintiff's testimony and the records of Dr. Gomes, who prescribed hydrocodone.  There is no indication that the alleged allergy was brought to Dr. Gomes's attention.

Case No. 8:13-CV-2175-T-17TGW

At Coastal Behavioral, Inc., various medications were prescribed for Plaintiff, which caused adverse side effects. The Coastal records show that a number of different medications were tried, but ultimately Plaintiff did not continue treatment after September, 2011.

The Coastal records also show that the doctor explained that treatment for Plaintiff's pain may be available through County resources. The Coastal records state that Plaintiff intended to obtain care through North Port Health Department, but there is no record that Plaintiff did so.

Plaintiff testified that he cannot grasp and hold objects. Dr. Cassell found Plaintiff had diminished sensation in the upper extremities, but normal strength. Dr. Bordy found Plaintiff's strength and fine manipulation in upper extremities to be normal, and Dr. Gomes found Plaintiff's strength in the upper extremities to be normal. There is no objective medical evidence of Plaintiff's inability to grasp and hold objects.

Plaintiff used a cane to ambulate at the hearing; there is no evidence that a physician prescribed an assistive device. When Plaintiff was evaluated by Dr. Bordy, Plaintiff did not use an assistive device, and was able to ambulate, with some pain, without one. On 4/28/2011, two months after Dr. Bordy's evaluation, Dr. Gomes opines that Plaintiff requires a motorized wheelchair; the Court infers that at that time Dr. Gomes believed that Plaintiff could not ambulate without an assistive device.

The ALJ weighed the fact that Plaintiff did not seek treatment for ongoing pain for a significant amount of time in determining Plaintiff's credibility, but the denial of disability benefits is not premised directly on the failure of Plaintiff to follow prescribed treatment. Plaintiff has not directly challenged the ALJ's credibility determination; the Court has included the above only to show that substantial evidence supports the ALJ's determination of partial credibility.

Case No. 8:13-CV-2175-T-17TGW

1. ALJ's Rejection of Dr. Gomes's 2010 Opinion of Exertional Limitations

The ALJ placed minimal weight on the January 2010 and April 2010 (sic) opinions of Dr. Gomes that Plaintiff should avoid lifting anything over 20 pounds and not perform repetitive bending or high impact activities, on the basis that the opinions are not consistent with Dr. Gomes's own medical records, and contradict Plaintiff's statements.

Medical opinions are statements from physicians...or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including...symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairment(s), and [a claimant's] physical or mental restrictions.   See 20 CFR Sec. 404.1527(a)(2)

A treating physician's opinion will be granted controlling weight if it is consistent with other medical evidence and is well-supported by acceptable clinical and diagnostic techniques.   20 C.F.R. § 404.1527(d)(2).   Where some medical evidence is found to be inconsistent with the treating physician's opinion, the ALJ should give the opinion "substantial or considerable" weight unless "good cause" is shown to the contrary. Lewis v. Callahan, 125 F.3d 1436, 1140 (11th Cir. 1997).   The Eleventh Circuit has found "good cause" to exist where: (1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records.   Wright v. Barnhart, 153 Fed. Appx. 678, 684 (11th Cir. 2005).   If the ALJ grants less than substantial or considerable weight to a treating physician, the ALJ  must clearly articulate the reasons for doing so. MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

The ALJ discounted the opinion of Dr. Gomes of January, 2010  that Plaintiff should avoid lifting anything over 20 pounds, not perform repetitive bending or high impact activities.   The ALJ explained that Dr. Gomes's opinion is not consistent with Dr. Gomes's own medical records, relying on an x-ray showing normal signs and an MRI

23

Case No. 8:13-CV-2175-T-17TGW

with unremarkable results, which diminished Dr. Gomes's severity assessment. The ALJ also stated that Dr. Gomes's opinion contradicts Plaintiff's testimony, including the fact that Plaintiff did not take medicine as prescribed. The ALJ stated that Plaintiff does not exhibit the extreme exacerbations in the record that Dr. Gomes alleged in his medical source statement, such that Dr. Gomes's opinion is not supported by or consistent with the overall medical evidence of record.

The assigned Magistrate Judge found that the ALJ did not articulate good cause to discount Dr. Gomes's opinion as to the above restrictions, which was in error. Although the ALJ erred, the assigned Magistrate Judge found the error to be harmless, where the VE identified a job that is within Plaintiff's correct RFC, light work, restricted to simple and routine tasks.

The ALJ's explanation applies to Dr. Gomes's opinion of April, 2011. The ALJ did not articulate good cause to discount Dr. Gomes's opinion of January, 2010, which includes restrictions as to lifting anything over 20 pounds, and not performing repetitive bending or high impact activities. Therefore, the ALJ improperly discounted Dr. Gomes's opinion of January, 2010.

In determining Plaintiff's RFC, the ALJ relied on the opinion of the DDS consultant that Plaintiff could perform medium work. "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. See 20 CFR Sec. 404.1567(c). If a claimant can do medium work, the claimant can also do light work and sedentary work. Id.

"Light work" involves "lifting no more than 20 pounds at a time, with frequent lifting and carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If

24

Case No. 8:13-CV-2175-T-17TGW

someone can do light work, he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." See 20 CFR Sec. 404.1567(b).

If the ALJ had credited the restrictions in Dr. Gomes's January 2010 opinion, the ALJ would have determined Plaintiff to have the residual functional capacity to perform light work, rather than medium work, and Plaintiff should be limited to simple and routine tasks. In this case, when the ALJ posed a hypothetical question to the VE, the ALJ included the parameters of "medium work"; when the ALJ added the restriction to simple, routine tasks, the VE testified that the hypothetical individual could not perform Plaintiff's past relevant work, but testified that there were other jobs that such an individual could perform. The ALJ asked the VE to identify other jobs at a variety of exertional levels. At the level of light work, the VE identified "Cashier" as light unskilled work, 2,300,000 jobs nationally, and 50,000 jobs in Florida.

When an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand. See Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir.1983); Caldwell v. Barnhart, 261 Fed. Appx. 188, 190 (11th Cir. 2008). In evaluating the necessity of a remand, the Court considers whether the record reveals evidentiary gaps which result in unfairness or clear prejudice. Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995). The likelihood of unfair prejudice may arise if there is an evidentiary gap that the claimant contends supports her allegations of disability. Id, at 936.

The Court finds that the ALJ erred in discounting the January, 2010 opinion of Dr. Gomes containing restrictions, but the error is harmless because there is VE testimony identifying other work that a hypothetical individual restricted to light work and simple, routine tasks could do, and that the work identified exists in significant numbers in the national economy, given Plaintiff's RFC as corrected, age, education and work experience. A remand is not necessary. Although Plaintiff does not have the RFC to perform past relevant work, the Agency met its burden at Step Five, and the ALJ's

25

Case No. 8:13-CV-2175-T-17TGW

determination that Plaintiff is not disabled is correct.

After consideration, the Court **overrules** Plaintiff's objection as to this issue.

2.  Rejection of Opinion of Treating Physician as to
    Inability to Sustain Work Activities - 4/28/2011 Opinion

The assigned Magistrate Judge found the ALJ adequately explained why the ALJ discounted Dr. Gomes's opinion that Plaintiff was totally disabled, based on inconsistency between the opinion and a normal X-ray in January, 2011 and an unremarkable MRI in June, 2010.  The assigned Magistrate Judge noted that Plaintiff has not pointed to any objective medical findings that refute the ALJ's assessment. The assigned Magistrate Judge further noted that the ALJ discounted the opinion of total disability because Plaintiff's testimony that he was not taking any pain medication contradicts this opinion, and Plaintiff testified that he regularly suffered pain at the level of 9 or 10 out of 10.  Plaintiff testified that he does not have a primary care doctor,  had not seen any doctor for six months prior to the hearing, and the side effects of medication caused even more pain.  The assigned Magistrate Judge further noted that the ALJ also discounted Dr. Gomes's opinion of total disability because of the extreme exacerbations that the doctor stated.   The assigned Magistrate Judge found that the ALJ reasonably determined that the record did not support a substantial deterioration in Plaintiff's condition from April 2010 to April 2011.

The ALJ properly discounted the opinion of Dr. Gomes of 4/28/2011 to the extent the opinion found Plaintiff to be permanently and totally disabled, and unable to return to substantial gainful employment.  The ultimate issue of whether Plaintiff is disabled or unable to work is reserved to the Commissioner.   See 20 CFR Sec. 404.1527(d).

In this case, the ALJ determined Plaintiff's RFC, found that Plaintiff is unable to perform past relevant work, since that work exceeded Plaintiff's RFC of simple and

Case No. 8:13-CV-2175-T-17TGW

routine work, then considered Plaintiff's age, education, work experience and RFC, and
the testimony of the VE,  in finding that there are jobs that exist in significant numbers in
the national economy that Plaintiff can perform, and Plaintiff is capable of making a
successful adjustment to other such work.  The ALJ ultimately determined that Plaintiff
has not been under a disability, as defined in the Social Security Act, from December
18, 2009, through the date of the decision, April 27, 2012.

After consideration, the Court **overrules** Plaintiff's objection as to this issue.

3.  ALJ's Reliance on Opinion of Dr. Molis and/or Single Decision Maker

The ALJ accorded significant weight to the opinion of the state agency medical
consultant, who stated that Plaintiff could perform medium exertional work.  The ALJ
stated that the RFC opinion of Dr. Molis of 4/11/2011is supported by treatment records
(Exhibits 5F, 9F, 10F, 11F) and Plaintiff's testimony that Plaintiff does not see the
doctor or take his medicine.  The ALJ further stated that Dr. Molis's opinion is based on
a review of a complete case record, that includes a medical report from a specialist in
the individual's particular impairment which provides a more detailed and
comprehensive information than what was available to the individual's treating source.
The ALJ found that Dr. Molis' opinion is supported by and consistent with the medical
evidence of record.

The assigned Magistrate Judge noted that there is no indication that Dr. Molis
merely relied merely on the assessment of the single decision-maker, as Dr. Molis
states that he reviewed all the medical evidence on file.

The assigned Magistrate Judge found that the ALJ erred in according significant
weight to Dr. Molis's opinion, in that Dr. Molis did not explain his opinion, unlike many
reviewing doctors, and, since the ALJ did not properly discount Dr. Gomes's opinion of

27

Case No. 8:13-CV-2175-T-17TGW

lifting restrictions, the reviewer's opinion must yield to the treating doctor's opinion. Sharfarz v. Bowen, 825 F.2d 278 (11th Cir. 1987). Dr. Gomes's opinion that Plaintiff is limited to lifting 20 pounds overcomes Dr. Molis's implicit finding that Plaintiff could lift 50 pounds. Although the ALJ erred, the assigned Magistrate Judge found the error to be harmless, where the VE identified a job that is within Plaintiff's correct RFC, light work, restricted to simple and routine tasks.

The Court determined above that the ALJ erred, but the error is harmless.

After consideration, the Court **overrules** Plaintiff's objection as to this issue.

4. ALJ's Failure to Satisfy the Commissioner's Burden at Step Five

The assigned Magistrate Judge stated that Plaintiff's contention that Commissioner has not shown that there is work in the national economy that Plaintiff can perform is refuted by the evidence that Plaintiff can perform the job of cashier. The assigned Magistrate Judge further states that Plaintiff has not specified any functional limitations that should have been included in the hypothetical question posed to the VE, but were not. Since the ALJ reasonably discounted the extreme limitations included in the opinion of Dr. Gomes of April 28, 201, those limitations did not need to be included in the hypothetical question posed to the VE. Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1161 (11th Cir. 2004).

Based on Plaintiff's testimony and treatment notes from Coastal Behavioral Healthcare, the ALJ limited Plaintiff's RFC to simple and routine tasks. The ALJ asked the VE whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience and residual functional capacity. The VE testified that, given all of these factors, the individual would be able to perform the representative requirements of occupations such as a cashier, rated at the light exertional level with an

Case No. 8:13-CV-2175-T-17TGW

SVP of 2 (2,300,000 positions exist nationally and 50,000 exist in Florida, DOT #211.462.010). The ALJ further stated that the ALJ has determined that the VE's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

As noted above, the ALJ erred in her RFC determination of medium work, and in according more weight to the opinion of Dr. Molis, but when the limitations specified in the opinion of Dr. Gomes are taken into account, the VE's testimony supports the Step Five determination of the ALJ.

After consideration, the Court **overrules** Plaintiff's objection as to this issue. Accordingly, it is

**ORDERED** that Plaintiff's Objections are **overruled**; the Report and Recommendation is **adopted** and incorporated herein by reference. The decision of the Commissioner denying benefits to Plaintiff is **affirmed**. The Clerk of Court shall enter a final judgment in favor of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security, and close this case.

**DONE and ORDERED** in Chambers, in Tampa, Florida on this ___ day of September, 2014.

ELIZABETH A. KOVACHEVICH
United States District Judge

Copies to:
All parties and counsel of record

29